# IN THE COURT OF APPEALS OF IOWA

No. 20-0632
Filed January 21, 2021

**EASTON ARMSTRONG,**
Petitioner-Appellee,

**vs.**

**HOLLY CURTIS,**
Respondent-Appellant.

_____

Appeal from the Iowa District Court for Scott County, John D. Telleen, Judge.

A mother appeals the district court's ruling awarding physical care of the parties' minor child to the father and restricting her rights as a joint legal custodian. **AFFIRMED AS MODIFIED.**

Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West Des Moines, for appellant.

Catherine Z. Cartee and Chase Cartee of Cartee Law Firm, P.C., Davenport, for appellee.

Considered by Doyle, P.J., Mullins, J., and Mahan, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2021).

**DOYLE, Presiding Judge.**

After trial on a petition to establish paternity, custody and visitation, the district court awarded the parties joint legal custody of their minor child, but ordered that all medical care and educational decisions be made by the father. The court also awarded physical care of the child to the father. The mother appeals. She argues the district court erred in granting the father sole discretion to make medical and educational decisions. She also argues it is in the best interests of the child that he be placed in her physical care. Clear and convincing evidence does not support awarding the father sole discretion in deciding on the child's medical care and education. We therefore modify the district court's order to provide that the parties are awarded unqualified joint legal custody of the parties' minor child. We affirm the court's order in all other respects.

## I. Proceedings and Facts.

Holly Curtis and Easton Armstrong are the parents of S.J.A. They never married. Holly and Easton knew each other in high school but did not become romantically involved until 2017. Holly became pregnant. Their relationship was rocky during the pregnancy. The parties became argumentative, and by July 2018, Easton began surreptitiously recording Holly's outbursts. S.J.A was born in November 2018.

Holly and Easton continued to fight and there were physical altercations. By February 2019, the parties filed dueling petitions for relief from domestic abuse. The court entered a temporary protection order against Holly. S.J.A. was placed in Easton's physical care, where he has remained ever since. After a trial in May

2019 on Easton's petition, the court entered a final domestic abuse protective order against Holly and granted Easton temporary custody of S.J.A.

Also in February 2019, Easton petitioned to establish paternity, custody and visitation. The matter was tried over three days in December 2019.

At the time of trial, Holly was thirty-three years-old. She is a high school graduate. She obtained an esthetics diploma and in 2016, Holly started an esthetic business working from her home. She treats skin through facial treatments, peel waxing, tinting on brows and lashes. Speed waxing is about ninety percent of her business. She averages twenty clients a week handles all the tasks associated with the operation of her business.

Holly has three children by a previous relationship—twin daughters, aged eight at time of trial, and a son, aged five. She homeschools the three children. Holly juggles her time between homeschooling her children and working in her at-home esthetic salon. Holly admits being a single parent is difficult but she has a strong support network to help her.

Easton was thirty-six years-old at the time of trial and a college graduate. He is self-employed and owns a company that sells materials to the construction industry. After his father passed away, Easton became the sole owner of the business. He reduced his work hours to care for S.J.A. Since February 2019, Easton has provided most of the daily care for S.J.A. with help from his mother.

In March 2020, the district court entered its findings of fact, conclusions of law, and order establishing paternity, custody and visitation. Pertinent to this appeal, the court awarded the parties joint legal custody of S.J.A., but reserved for Easton the sole right to decide on S.J.A.'s medical care and education. Easton

was granted physical care of S.J.A. Holly appeals arguing she should be awarded physical care of S.J.A and "unconditional" joint legal custody.

## II. Scope and Standard of Review.

The district court tries custody matters in equity, so we review the proceedings de novo. Iowa R. App. P. 6.907. We give weight to the district court's fact findings, but we are not bound by them. *In re Marriage of Mauer*, 874 N.W.2d 103, 106 (Iowa 2016).

## III. Analysis.

"Iowa Code chapter 600B confers subject matter jurisdiction upon the district court to decide cases of paternity, custody, visitation and support between unmarried parties." *Montgomery v. Wells*, 708 N.W.2d 704, 707 (Iowa Ct. App. 2005). Relevant here, "section 600B.40 grants the district court authority to determine matters of custody and visitation as it would under Iowa Code section 598.41"—section 600B.40's counterpart for divorcing or separating parents. *See id.*; *see also Braunschweig v. Fahrenkrog*, 773 N.W.2d 888, 891 n.3 (Iowa 2009); *Hensch v. Mysak*, 902 N.W.2d 822, 825 (Iowa Ct. App. 2017).

### A. Legal Custody.

Joint legal custody constitutes parental rights and responsibilities that "include but are not limited to equal participation in decisions affecting the child's legal status, medical care, education, extracurricular activities, and religious instruction." Iowa Code § 598.1(3) (2019). Joint legal custody means that "neither parent has legal custodial rights superior to those of the other parent." *Id.*; *In re Marriage of Hynick*, 727 N.W.2d 575, 579 (Iowa 2007).

Our overriding consideration is the best interests of the child. *See* Iowa R. App. P. 6.904(3)(o). In considering what custodial arrangement is in the child's best interests, we consider the nonexclusive factors set out by our legislature in Iowa Code section 598.41(3). *See* Iowa Code § 600B.40(2) ("In determining the visitation or custody arrangements of a child born out of wedlock, . . . the court shall consider the factors specified in section 598.41, subsection 3."). Some of the pertinent factors here are: whether each parent would be a suitable custodian for the child, whether the parents can communicate with each other about the child's needs, whether both parents have actively cared for the child before and since the separation, whether each parent can support the other parent's relationship with the child, whether one or both parents agree or oppose joint custody, the geographic proximity of the parents, whether the safety of the child . . . or the other parent will be jeopardized by the awarding of joint custody or by unsupervised or unrestricted visitation, and whether a history of domestic abuse, as defined in section 236.2, exists. *Id.* § 598.41(3)(a)-(j).

Parents' "utter inability to communicate with each other" as a result of their "toxic relationship" weighs against joint legal custody. *See In re Marriage of Gensley*, 777 N.W.2d 705, 715 (Iowa Ct. App. 2009). But the parties' inability to communicate and cooperate must rise above the "usual acrimony that accompanies a divorce." *In re Marriage of Ertmann*, 376 N.W.2d 918, 920 (Iowa Ct. App. 1985). Tension between the parents is not alone sufficient to show joint legal custody will not work. *In re Marriage of Bolin*, 336 N.W.2d 441, 446 (Iowa 1983).

"If the district court does not grant joint legal custody, the court must cite clear and convincing evidence, according to the enumerated factors listed above, that joint legal custody is unreasonable and not in the child[]'s best interests 'to the extent that the legal custodial relationship between the child and a parent should be severed.'" *Gensley*, 777 N.W.2d at 714 (citing Iowa Code § 598.41(2)(b)).

**B. Hybrid Legal Custody.**

Both parties requested joint legal custody of S.J.A. The district court awarded the parties joint legal custody, but did not award full "joint legal custody," as that term is defined. *See* Iowa Code § 598.1(3) (listing rights and responsibilities as including "equal participation in decisions affecting the child's legal status, medical care, education, extracurricular activities, and religious instruction"); *Hynick*, 727 N.W.2d at 579. Instead, the court unbundled those rights and ordered that all decisions concerning medical care, including vaccinations, and education be made by Easton.

Neither party challenges the validity of the hybrid legal custody decision— instead they concentrate on the merits of the decision. So we are not cited any authority either allowing or prohibiting the practice. Turning to chapter 598, it appears to consider joint custody and sole custody as all-or-nothing propositions. *See In re Marriage of Milne*, No. 20-0228, 2020 WL 5230461, at *4 (Iowa Ct. App. Sept. 2, 2020). When parties are awarded "joint legal custody," "both parents have legal custodial rights and responsibilities toward the child" and "neither parent has legal custodial rights superior to those of the other parent." Iowa Code § 598.1(3); *In re Marriage of Hansen*, 733 N.W.2d 683, 690 (Iowa 2007). The statutes mention nothing about assigning sole decision-making authority for some responsibilities

and joint participation for others. Iowa's legal landscape is virtually barren of appellate cases in which the district court unbundled legal custody rights. *See, e.g., Sloan v. Casey*, No. 15-0921, 2015 WL 9451093, at * 7–8 (Iowa Ct. App. Dec. 23, 2015) (upholding modification of joint legal custody to make one parent solely responsible for scheduling medical appointments for child); *In re Marriage of Bates*, No. 11-1293, 2012 WL 1440340, at *4 (Iowa Ct. App. Apr. 25, 2012) (affirming it was in children's best interests that one parent have the sole responsibility for decisions involving their medical care). Our supreme court has not spoken on the matter. But, in view of our disposition, we need not decide here the propriety of unbundling legal custody rights.

Holly asserts the district court erred in limiting her rights as a joint legal custodian. The district court voiced its concerns about Holly's parenting regarding her children's' vaccinations and education:

> The evidence clearly indicates that Holly does not believe the children should be vaccinated. Her oldest children apparently had the first early round of vaccinations but none further. In this litigation Holly refused to produce their medical records in order to allow opposing counsel to inquire into this. During her testimony, Holly was very evasive concerning the vaccination issue. Her son who is five has not been vaccinated. The applicable Iowa statutes and Department of Public Health regulations clearly strongly favor vaccinations and require them except in limited circumstances.[1] "Iowa Courts have historically favored a parent who provides immunizations when determining which parent should have physical care of a child." *In re Marriage of Asefi*, [No. 12-1787, 2013 WL 4011156, at *4 (Iowa Ct. App. Aug. 7, 2013)] citing *Lambert v. Everist*, 418 N.W.2d 40, 43 (Iowa 1988). Given the overwhelming

---

[1] *See* Iowa Code § 139A.8(1) requiring parents or legal guardians to assure minor children are immunized against certain diseases. *See Rodgers v. Clark*, No. 06-0802, 2007 WL 108486, at *3 (Iowa Ct. App. Jan. 18, 2007). The statute also precludes a child's enrollment in any licensed child care center, elementary or secondary school in Iowa if the child is not so vaccinated. Iowa Code § 139A.8(2). Certain exceptions apply. *Id.* § 139A.8(4).

weight of medical authority supporting vaccinations, the Court questions her judgment in refusing to vaccinate her children. Holly obviously feels very strongly about this issue.

The court noted "Holly also does not particularly believe in traditional medicine and prefers holistic nontraditional methods." In granting Easton sole authority to make medical decisions, the court reasoned:

> Easton expressed concern over their inability to agree such things as vaccination and education. While the evidence does indicate that at one point early on Easton was willing to go along with Holly's decision not vaccinate the children, he clearly is no longer of this view. He filed a motion for a Court order allowing the children to be vaccinated which Holly has strenuously resisted. She asserted among other things that the child should have DNA testing before any decision regarding vaccination was made. The Court believes there is no scientific support for Holly's belief in this regard.

As to education, the district court "was far from impressed with the homeschooling education being provided by Holly."

In unbundling the authority to make medical and educational decisions and awarding that power to Easton, the court in effect awarded Easton sole legal custody over those issues. If the district court grants sole custody to one parent, it must cite clear and convincing evidence that joint custody is unreasonable and not in the child's best interests to the extent that the legal custodial relationship between the child and a parent should be severed. Iowa Code § 589.41(2)(b). On appeal, Holly argues clear and convincing evidence does not support a limitation of her rights as a joint legal custodian regarding medical and educational decisions. We agree.

There is no dispute that Holly's children are healthy. When asked if she believed in modern medicine, she replied:

I believe in modern medicine, but my first approach is always homeopathic. If I can do something at home first that is going to treat a cold or prevent getting something, you know, we stay on vitamins and that kind of thing.

We also believe in chiropractic care, so we routinely see a chiropractor, and like I said, we'll go to more drastic measures whenever needed.

Holly also testified:

It's our child and his well-being so that's the most important thing at the forefront, so we need to be able to come to an agreement with one another, no matter whose care he is in.

She wanted "the best possible outcome for [S.J.A.'s] health." That having been said, the parties should be able to work together on medical issues such as vaccinations.

Taking into account the requisite factors, we do not find that the evidence rises to a level of clear and convincing evidence showing joint legal custody is unreasonable and not in the S.J.A.'s best interests to the extent that the legal custodial relationship between S.J.A. and his mother should be severed for medical decisions. The difference of opinion between Holly and Easton on medical issues does not appear to be intractable.

The same can be said of the education issue. Holly testified,

Education wise, it's—I have not planned out five years down the road. I never honestly planned indefinitely to be homeschooling forever. I mean, it just—we started out that way, and it's been going really well.

As far as [S.J.A.], Easton and I had big differences on his education, and I just have my preference as to a private Christian school.

Holly had the children enrolled at a private Christian school in 2019 but they did not attend due to lack of finances.[2] Holly testified,

> I said I would prefer a Christian private school. . . . [Easton] said he would not pay for one, and he said he'd prefer public school. And I basically did not want to continue to talk about something that felt so far down the road. But I never had plans to homeschool [S.J.A.].

On appeal, Holly argues clear and convincing evidence does not support Easton receiving sole legal custody to make educational decisions for thirteen-month-old S.J.A. Again, we agree. While Holly and Easton may now disagree about whether to send S.J.A. to parochial or public school, their disagreement does not appear to be intractable. In any event, S.J.A is still very young and years from even starting pre-school.

Even though the parties disagree on some matters, these problems should be able to be resolved to the benefit of the child. *See Gensley,* 777 N.W.2d at 716. Because clear and convincing evidence does not support awarding Easton sole legal custody to make medical and educational decisions on behalf of S.J.A., we modify the district court's order. We eliminate the provision awarding Easton sole decision making authority on S.J.A.'s medical care and educational matters. The parties are therefore awarded unqualified joint legal custody of the parties' minor child S.J.A.

**C. Physical Care.**

"Physical care" is "the right and responsibility to maintain a home for the minor child and provide for routine care of the child." Iowa Code § 598.1(7). Here,

---

[2] Holly's oldest son may have attended the school in 2018, but the testimony is not absolutely clear.

each party sought physical care and neither requested a joint physical care arrangement. In any event, because of the history of disputes and absence of mutual respect between Holly and Easton, joint physical care is not warranted. *See Hynick*, 727 N.W.2d at 579. "When joint physical care is not warranted, the court must choose one parent to be the primary caretaker, awarding the other parent visitation rights." *Id.*

In determining what physical care arrangement is in the child's best interests, the district court is guided by the factors enumerated in section 598.41(3), as well as other nonexclusive factors set out in *In re Marriage of Winter,* 223 N.W.2d 165, 166-67 (Iowa 1974). *See Hansen,* 733 N.W.2d at 696-99 (holding that although section 598.41(3) does not directly apply to physical care decisions, "the factors listed [in this code section] as well as other facts and circumstances are relevant in determining whether joint physical care is in the best interest of the child"); *McKee v. Dicus,* 785 N.W.2d 733, 737 (Iowa Ct. App. 2010). Although consideration is given in any custody dispute to allowing the child to remain with a parent who has been the primary caretaker, *see Hansen,* 733 N.W.2d at 696, the fact that a parent was the primary caretaker of the child before separation does not assure an award of physical care, *see In re Marriage of Toedter,* 473 N.W.2d 233, 234 (Iowa Ct. App. 1991). Our law requires that a custody award will "assure the child maximum continuing physical and emotional contact with both parents." Iowa Code § 598.41(1)(a). But the ultimate objective of a physical care determination is to place the child in the environment most likely to bring the child to healthy physical, mental, and social maturity. *See in re Marriage of Murphy,* 592 N.W.2d 681, 683 (Iowa 1999); *In re Marriage of Courtade,*

560 N.W.2d 36, 38 (Iowa Ct. App. 1996). The best-interest determination is not based "upon perceived fairness to the [parents]." *Hansen,* 733 N.W.2d at 695. Because each family is unique, the decision mainly turns on the particular circumstances of each case. *See id.* at 699.

Holly argues she should be awarded physical care of S.J.A. Holly contends the district court placed too much weight on Easton's audio recordings of their arguments.

The district court had the advantage of listening and observing each witness's demeanor firsthand. It is clear the district court's findings turned on its assessment of the credibility of the witnesses, or, more specifically, the court's determination that Easton testified credibly. On the other hand, the court found some of Holly's testimony to be "evasive."

Some of the factors considered by the district court were the character, stability and mental health of each parent and the ability of each parent to co-parent and support the relationship with the child with the other parent. The court found,

> [a] parent that frequently viciously attacks, berates, belittles and swears at the other parent does not demonstrate the appropriate attributes to be awarded primary care, even if that parent has otherwise done a good job raising other children. Unfortunately, with respect to Holly, that is what the evidence demonstrates here.

Without repeating that evidence here, we agree the evidence supports the district court's assessment. And the court noted,

> The bottom line to all of the above is that Holly did commit domestic abuse and the Court has real concerns about her being able to control her anger and her emotional stability. Many of her tirades took place with the children present. This sets a very poor example for them. It also is highly unlikely that she would be willing to support

Easton's relationship with S.J.A. if she were to be awarded primary care.

Aside from medical issues and what it viewed as sub-par homeschooling, the court also had concerns that Holly did not co-parent well with the father of her older three children, "making it less likely she could do so with Easton." In that regard, the court found,

> While Holly may be a good mother to her children when she is by herself, it appeared to the Court that she does not successfully co-parent with the fathers of her children, especially Easton. She is controlling and insists on having things her way. When she does not get things her way she flies off the handle and explodes into an angry tirade, many times including physical violence. The tapes and Easton's testimony reveal that she often has these tirades in front of the children.

The district court then turned to Easton's characteristics as a father and stated:

> Turning to Easton's characteristics as a father, given the fact that S.J.A. is only a little over a year old, Easton has a limited track record, but the evidence the Court did receive is positive. The evidence demonstrates that he personally cares for all of the daily needs for S.J.A. He drastically reduced his work hours in order to be able to do so. As noted above, he set up a crib in his office. His mother understandably helps out, but Easton provides most of the care. He feeds, bathes, and plays with his son. His family members credibly testified he is a devoted father and does a good job. In comparing the two parents, Easton is by far the more stable and mature individual. He values education, and the Court has no doubt he will instill a positive work ethic. He is obviously well able to take care of all of the material needs of S.J.A. Especially given his college education and successful business, the Court believes it is likely S.J.A. will be placed on a successful career path. [Easton] is close to his family and S.J.A. will be raised near his extended family.
> . . .
> The evidence also indicates that Easton had his mother care for S.J.A. when Easton was out of town for ten days, without offering any extra time to Holly. He provided Holly only with her scheduled visitation. This also seems to have been rather punitive. The Court understands that in the midst of a highly charged custody case and after a lengthy domestic abuse trial, he would not have been too

inclined to extend an olive branch of extra time. The Court also bears in mind that on two separate occasions Holly reported Easton to the DHS for unfounded reasons and this probably made him less inclined to give her any more time and ordered the Court.

After considering all the evidence, the district court determined:

> that it will be in the long-term interest of S.J.A. to award [physical] care to Easton. He is by far the more mentally stable and mature parent. He is well able to satisfy the emotional, social, moral, material and educational needs of the child. The Court concludes he would be far more likely to support Holly's relationship with S.J.A. than Holly would to support Easton's relationship with S.J.A. if Holly were to be awarded [physical] care.
> In reaching this conclusion the Court did consider the fact that S.J.A. has siblings but that is not a terribly important factor given that S.J.A. has been living with Easton since three or four months of age. The Court also considered the fact that S.J.A. has now been living with Easton for over a year. While the Court does conclude from the testimony Easton has been doing a fine job raising S.J.A., considering the circumstances under which he first obtained custody, the Court did not believe it would be equitable to place much weight on the fact that he has been the primary care provider since that was as a result of the Court order.

After a de novo review of the evidence, we agree.

We do not discount the fact that Holly is a good mother, but we cannot ignore the district court's findings that she does not successfully co-parent with the fathers of her children. "The Iowa courts have been clear that the ability to support the other parent and not exhibit hostility or ill will toward them is an important factor to consider in making a custodial award." *In re Marriage of Johnston*, No. 01-0606, 2002 WL 535104, at *2 (Iowa Ct. App. April 10, 2002).

We also consider the presumption that siblings, including half-siblings, should not be separated. *In re Marriage of Smiley*, 518 N.W.2d 376, 380 (Iowa 1994); *In re Marriage of Quirk–Edwards*, 509 N.W.2d 476, 480 (Iowa 1993); *In re Marriage of Orte*, 389 N.W.2d 373, 374 (Iowa 1986); *In re Marriage of Dimartino*,

No. 13-0727, 2014 WL 5861816, at *7 (Iowa Ct. App., Nov. 13, 2014); *Willenbring v. Roepcke*, No. 05-1261, 2006 WL 624578, at *3 (Iowa Ct. App. Mar. 15, 2006). S.J.A has three older siblings and Holly's testimony shows that their relationship is very loving. S.J.A. starts squealing and grabbing his siblings because he is so excited to see them during visits. The presumption that siblings should reside together may be overcome only if their separation "may better promote the long-range interests of children." *Orte*, 389 N.W.2d at 374. Here, the long-range interests of S.J.A. are best served in Easton's physical care. For these reasons we affirm the district court's order awarding Easton physical care of S.J.A.

### D. Appellate Attorney Fees

Holly requests that we award her attorney' fees on appeal. In support of her request she claims she earns $17,000 and Easton makes at least $250,000 annually. "In a proceeding to determine custody or visitation, . . . the court may award the prevailing party reasonable attorney fees." Iowa Code § 600B.26. "An award of appellate attorney fees is within the discretion of the appellate court." *In re Fiscus*, 819 N.W.2d 420, 425 (Iowa Ct. App. 2012) (citation omitted). In determining whether to award attorney fees, we consider "the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the trial court's decision on appeal." *Id.* (citation omitted). Such an award may be granted depending on the parties' respective abilities to pay. *In re Marriage of Willcoxson*, 250 N.W.2d 425, 427 (Iowa 1977); *In re Marriage of Giles*, 338 N.W.2d 544, 546 (Iowa Ct. App. 1983).

Although Holly achieved a small victory in this appeal, she can hardly be seen as the "prevailing party." But she did prevail on one issue, thus we have

some discretion in awarding her appellate attorney fees. Her attorney fee affidavit shows appellate attorney fees and costs totaling $25,090.00. Her appellate attorney was not her trial attorney, so to get up to speed, he had to familiarize himself with over 1300 pages of trial transcript, over 1000 pages of exhibits, and over 400 pages of district court pleadings. We find the attorney fees and costs well within reason. Easton can pay and Holly has the need. But in view of Holly's limited success, we order Easton to pay one-third of Holly's appellate attorney fees and costs. Court costs are assessed equally to the parties.

**AFFIRMED AS MODIFIED.**